Kenneth STAHLHUT,
Plaintiff-Respondent,

v.

SIRLOIN STOCKADE, INC., et al.,
Defendants-Appellants-Respondents.

MARTIN BROTHERS TILE COMPANY,
Plaintiff-Respondent,

v.

SIRLOIN STOCKADE, INC., et al.,
Defendants-Appellants.

Nos. KCD 28486, KCD 28502.

Missouri Court of Appeals,
Kansas City District.

June 12, 1978.

Gayles R. Pine, Robert G. Ulrick, Warrensburg, for Kenneth Stahlhut.

Donald E. Raymond, Kansas City, for Sirloin Stockade, Inc.

F. Philip Kirwan, Margolin and Kirwan, Kansas City, for Home Indemnity Co.

J. Martin Anderson, Kansas City, for Martin Bros. Tile Co.

Before WELBORN, Special Judge, Presiding, PRITCHARD, J., and HIGGINS, Special Judge.

ROBERT R. WELBORN, Special Judge.

Actions by subcontractors to establish mechanics' liens and for recovery on surety bonds on construction project. Trial court upon trial of claims there consolidated refused to allow mechanics' liens but entered judgment in favor of subcontractors on performance bond. Surety on bond appeals.

On September 18, 1972, C. F. Moreland Construction Company, a Missouri partnership composed of C. F. Moreland and Keith

Crawford, entered into a contract with Sirloin Stockade, Inc., for the construction by Moreland of a building for Sirloin in Warrensburg. The contract price was $82,820.00. The contract required Moreland to furnish a bond to protect the owner against loss occasioned by mechanics' liens and against loss on account of materials or labor furnished for the project.

Moreland obtained two bonds from The Home Indemnity Company. One was a performance bond, the other a payment bond.

Moreland began work on the project and completed the site work in January, 1973. The work was held up because of changes in the building plan.

On January 24, 1973, a corporation was organized under Texas law by three otherwise unidentified incorporators. The name of the corporation was T.M.C. Construction & Investment, Inc. Moreland, Crawford and Grady Truitt were named as original directors of the corporation. In April, 1973, Home issued endorsements on workmen's compensation and contractor's general liability policies issued by it to Moreland by which T.M.C. was added as a named insured under the policies.

Although there was no formal assignment of the contract between Sirloin and Moreland, according to Crawford, T.M.C. took over the Warrensburg project as the general contractor.

Under date of April 6, 1973, T.M.C. entered into three Sub-contract Agreements with Kenneth Stahlhut on the Warrensburg job. One was for complete roofing, at a contract price of $3,500.00. The second was for masonry work, at a contract price of $10,900.00. The third was for sheet rock at $2,600.00. Stahlhut began work on the project. He billed T.M.C. for progress payments and received payment from T.M.C. He also received one payment from Moreland Crawford Corporation, Inc., by a check which was returned for insufficient funds. The amount of the check was eventually paid.

Some date prior to October 16, 1973, Stahlhut submitted his final request for payment to T.M.C. in the amount of $6,049.44. This included the amount due and unpaid under his three subcontracts, plus $246.21 claimed due for extra work. T.M.C., on October 16, 1973, advised Stahlhut that it had paid Stahlhut's suppliers $2,032.02 which should be credited against the amount claimed by Stahlhut. T.M.C. also rejected the claim for extra work and told Stahlhut that the amount owed him was $3,671.28.

On July 30, 1973, Martin Brothers Tile Company entered into a written subcontract agreement with T.M.C. under which Martin was to provide labor and material for installation of ceramic and quarry tile on the Warrensburg job for a contract price of $5,193.00. Martin began work under the contract on July 30 and completed its contract November 1, 1973.

As the Warrensburg job progressed, Sirloin dealt with T.M.C. It forwarded a revised plot plan for the project to T.M.C. on July 12, 1973. On July 25, 1973, it issued change orders to T.M.C. One payment for work was made by Sirloin to T.M.C.

The Warrensburg job was beset with difficulties almost from the outset. A problem arose with regard to the location of the building which required changes in the foundation and footings after they had been laid. As early as April, 1973, Sirloin advised Home that complaints had been received that the contractor was not paying his bills. Difficulties with the contractor continued and on September 6, 1973, an attorney for Home addressed a letter to Moreland and T.M.G. Construction & Investment, referring to the bonds issued by Home and complaints which had been received about unpaid bills. On the same date, Sirloin notified the attorney for Home that it appeared that the contractor would be able to finish the job.

Earl Ulmer, construction coordinator for Sirloin, first visited the job in the latter part of September, 1973. He found much of the work which had been done unacceptable. Little work was being done. Bills were unpaid. He could not find Mr. Moreland or Mr. Crawford. He got in touch

with Home in October and told them he did not think the job was being done right. Home's attorney asked him to work with Mr. Hudson. Ulmer and Hudson went over the job on October 28 and the decision was made to terminate the construction contract.

On November 1, Stahlhut entered into a fourth subcontract with T.M.C., dated November 1, 1973, by which Stahlhut agreed to do the work necessary to complete the building for $16,500.00. According to Stahlhut, he discussed the contract with Moreland and Crawford before it was executed on behalf of T.M.C. by the job superintendent.

Jim Jenkins, whom Sirloin had hired as their job superintendent, learned of Stahlhut's contract and got in touch with Ulmer. Ulmer and Hudson came to Warrensburg on November 7 and met with Stahlhut and some suppliers who had not been paid for materials used on the job. According to Stahlhut, he told them of the amount due under his first three contracts. The fourth contract was discussed. Ulmer first told him that he did not know whether he could go along with that contract or not. After a telephone call, presumably to a Sirloin superior in Oklahoma City, Ulmer said, according to Stahlhut, for Stahlhut to go ahead and finish the job as soon as possible and "that one of them (Sirloin or Home) would have to pay me."

Ulmer's version of the conversation was somewhat different. According to him, after he returned to Oklahoma City following the October 28th meeting with Hudson, notice of termination of the contract was prepared and mailed to all interested parties, including T.M.C., Moreland and Home. Under the terms of the contract, ten days' notice of cancellation was required and that time had not passed at the time of the November 7th meeting. He told Stahlhut that, since Sirloin could not yet take over the job, he could not stop him from working and that if he felt that he had a bona fide contract with T.M.C. and was satisfied he was going to get his money, Sirloin could not at that time stop him from working.

He told Stahlhut: "I'm assuming that somebody has got to pay you if you work, if you do this work and it is acceptable, why then someone is going to pay you and probably it would be the bonding company. It is certainly not going to be the Sirloin Stockade."

By letter dated November 9, 1973, Sirloin's general counsel advised Stahlhut that it had declared its contract with Moreland in default. "We have never been advised what TMC Construction and Investment, Inc. legally has to do with the construction of our building and, therefore, cannot recognize your subcontract with TMC * *."

After receiving the letter, Stahlhut called Ulmer and talked to him. According to Ulmer, he again told Stahlhut that Sirloin could do nothing until the ten-day notice period had expired and that Ulmer could neither tell him to work or not to work on the job. He told Stahlhut that whatever work he did before the expiration of the notice period would have to be paid for by someone but that Sirloin would not pay him.

According to Stahlhut, he began working toward completion of the building. He contracted with electricians for completion of the wiring and work proceeded on the other matters called for by his contract.

Sirloin concluded that the necessary notices of termination of the contract had been served by November 13 and that it would take over the job on November 23. On that date, Ulmer came to the job and had everybody working on it leave. The locks on the building were all changed.

Sirloin entered into an oral arrangement with M & M Construction Company to complete the building. M & M was paid some $30,000 by Sirloin for completing the work. The building was opened on December 28. According to Stahlhut, he could have completed the job in about three days after he had been locked out at a cost of about $1,000.00.

On December 18, 1973, Stahlhut filed his claim for a mechanic's lien in the Johnson

County Circuit Court. Martin filed its lien claim on December 6, 1973.

On December 31, 1973, Stahlhut filed suit in the Johnson County Circuit Court against Sirloin, T.M.C., Moreland, Home and others. His amended petition on which the matter was tried was in four counts. By Count I, plaintiff claimed that $22,520.51 was due him under his contracts with T.M.C. He sought judgment in that amount against Sirloin, T.M.C., Moreland and Home and the establishment of a mechanic's lien on the Warrensburg premises. Count II sought recovery of $23,000 from Home under the *payment* bond issued by Home to Moreland. Count III sought $16,500 from Sirloin and Home on the grounds that they had agreed to pay Stahlhut that amount for the completion of the building. Count IV against Sirloin and Home sought actual and punitive damages for fraudulent representations.

Martin's petition, filed February 5, 1974, sought recovery of $5,193 claimed due it for work and material under its contract for its work on the job. It sought judgment in that amount against, among others, Sirloin, T.M.C., Moreland and Home and a mechanic's lien against the property.

The cases were consolidated and, along with those of other claimants, tried to the court. In Stahlhut's case, the court made the following finding:

"1. That as to Count I, plaintiff has complied with the terms of the several contracts entered into with the defendant prime contractors, T.M.C. Construction and Investment Company, Moreland-Crawford Corporation, C. F. Moreland Construction Company, Keith Crawford and C. F. Moreland, d/b/a C. F. Moreland Construction Company with reference to the construction of the Sirloin Stockade, Inc. building located in Johnson County, Missouri; that the materials and labor went into the construction of the said building and that there is now due and owing plaintiff by the said defendants the sum of $20,161.68 plus interest in the amount of $2,318.40, making a total due plaintiff of $22,408.08; that the defendant Home Indemnity Company is also liable to the plaintiff for the aforesaid amount of $22,480.08, as surety, on the performance bond executed by it due to the fact that the original contract has been breached by the original contractors; that T.M.C. Construction and Investment Company is the successor corporation to C. F. Moreland Construction Company and is liable for all of the latter's obligations."

The court found that plaintiff was not entitled to a mechanic's lien because of the inadequacy of his lien notice.

The court made a similar finding with respect to Martin, finding that Martin had not been paid for $5,193 worth of labor and materials, plus interest of $623.16. The court further found that Home had entered into a performance bond with Moreland and that the breach of the construction contract by Moreland and "successor contractors" rendered Home liable to Martin. Judgment was entered against T.M.C., Moreland, Moreland-Crawford Corporation, Inc., and Home for $5,816.16. Martin's lien claim was also rejected because of inadequacy of the lien statement.

■ Home appealed from the judgment against it in each case.

As to both respondents, appellant asserts that the trial court erred in entering judgment against it on its performance bond because by the express terms of that instrument no cause of action thereunder accrued for the benefit of either of the respondents.

As above noted, Home issued separate performance and payment bonds for the job. Although Stahlhut's petition stated its claim against Home on the payment bond, the judgment entered was on the performance bond. Martin's petition does not state the basis for its claim against Home, but, again, judgment in favor of Martin against Home was on the performance bond.

The performance bond contained the following provision:

"No right of action shall accrue on this bond to or for the use of any person or corporation other than the Owner named herein (Sirloin) or the heirs, executors, administrators or successors of the Owner."

In *La Salle Iron Works, Inc., v. Largen,* 410 S.W.2d 87 (Mo. banc 1966), the court recognized the right of a materialman who furnishes materials on a construction project to recover as a third-party beneficiary under a payment-bond issued to protect the owner against nonpayment of persons supplying labor or materials for the project. The court held that a bond conditioned upon the payment of claims for material and labor and not otherwise limiting the persons entitled to sue thereon evidences "an intent to confer a right of action upon materialmen against the surety; * * *." 410 S.W.2d 92.

Pertinent to this case is the court's observation (410 S.W.2d 91):

" * * * If the surety wishes to exclude this type of liability it may consider such a bond as is shown in *Bourrett v. W. M. Bride Construction Company,* 248 Iowa 1080, 84 N.W.2d 4, where all rights of action by any one except the named obligee in the bond were expressly excluded."

The *Bourrett* case involved a claim by a materialman under a bond which provided:

"That no right of action shall accrue upon or by reason hereof, to or for the use or benefit of any one other than the obligee herein named; * * *."

The court held that the bond was intended to indemnify the owner only. The provision of the bond limiting the right of action thereunder was said to make that conclusion "doubly clear." See 17 Am.Jur.2d, Contractors' Bonds, § 20, p. 205 (1964).

In *Coates v. U.S. Fidelity & Guaranty Co.,* 525 S.W.2d 654 (Mo.App.), the court applied the distinction recognized in *La Salle.* In *Coates,* laborers employed by a subcontractor on a project sought to recover unpaid wages from a surety which had issued separate performance and payment bonds on a project. The court noted that the performance bond gave no right of action to anyone other than the owner and purported to give no right of action to anyone else. The court concluded that any recovery by the laborers would have to be under the payment bond. For reasons not here important, the court further found against plaintiffs on the payment bond. *Coates* does not cite *La Salle,* but it is obviously consistent with the observation found in that case.

Respondent Stahlhut counters appellant's argument on this point by contending that the contract required the contractor to furnish a performance bond "for the full protection of Owner against loss or damage that may be occasioned by mechanics' or other liens, or by loss or claim on account of material or labor furnished, and as security for the due and faithful performance of this agreement * * *." Stahlhut argues that this provision required the performance bond to be for the payment for materials and labor furnished and that when the performance bond made the contract part of the bond, the bond must be construed to include an obligation by the surety for payment of labor and materialmen's unpaid claims.

■ This argument ignores the fact that the contractor did provide a payment bond, expressly conditioned upon payment for all labor and material. The parties to the contract have by this action construed it to permit separate bonds to be given to cover the obligations imposed under the contract. The separate bond for payment for labor and material fulfilled the contractor's obligation to provide a bond for such purpose. There is no reason to construe the performance bond and the contract as duplication of the coverage of the payment bond.

■ Appellant's contention on this issue is meritorious. Respondent Stahlhut suggests that the reference in the judgment to the performance bond was an oversight which this court can correct by substituting "payment" for "performance" in the trial court's judgment. Having been successful below, Stahlhut may advance in this court a theory of recovery rejected by the trial court even though he took no appeal and without necessity of reliance on the plain error rule. *Cascio v. Garrett,* 535 S.W.2d 272, 274[5, 6] (Mo.App.1976).

Stahlhut asserts that the evidence "clearly established" that he was entitled to recover on the payment bond. Appellant's reply brief asserts that there was no evidence warranting a finding of liability on the payment bond. Appellant asserts that Stahlhut produced no evidence that he qualified as a "claimant" under the payment bond, which included the following provision:

"1. A claimant is defined as one having a direct contract with the Principal or with a Subcontractor of the Principal for labor, material or both, used or reasonably required for use in the performance of the Contract, labor and material being construed to include that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental of equipment directly applicable to the Contract."

Appellant contends that the C. F. Moreland Construction Company, a partnership, was the principal of the payment bond and that Stahlhut's claim on the partnership contract was based upon contracts with T.M.C., not Moreland, and that his claim on the fourth or completion contract was based upon either a written contract with T.M.C. or an oral contract with Sirloin. Inasmuch as the trial court found against Stahlhut on the claimed oral contract with Sirloin, the contention that the payment bond did not cover such an obligation need not be pursued.

■ Stahlhut's principal reliance in arguing that the evidence showed liability of Home on the payment bond is upon the letter of Home's attorney, dated September 6, and addressed to, among others, T.M.C. Stahlhut argues that the letter referred specifically to Home's bonds and stated that the work was not proceeding to the satisfaction of the surety. Based on this letter, Stahlhut argues that Home is estopped to assert that T.M.C. was not covered as a principal under the bonds. Overlooking the question of the absence of any pleading of estoppel by Stahlhut, the argument is without merit because Stahlhut in no manner demonstrates the reliance upon that communication, essential to the establishment of an estoppel. *Chrysler Credit Corp. v. Friendly Ford, Inc.,* 535 S.W.2d 110, 112[1] (Mo.App.1976). There is no evidence that Stahlhut ever saw the letter and nothing to support any finding that he thereafter acted in reliance upon it.

■ Stahlhut also points to the trial court's findings that T.M.C. was a "successor" of Moreland. However, Stahlhut does not demonstrate how that finding causes T.M.C. to become a principal on the payment bond. The bond was issued to Moreland as principal. Nothing in the terms of the bond extends its coverage to a "successor" of the named principal. In fact there was evidence that Home refused to issue a bond covering T.M.C. In that situation, the court should not rewrite the bond to make T.M.C. a party to it.

Martin advances a theory for affirming the judgment in its favor on the performance bond. Its argument is that T.M.C. was a subcontractor under Moreland. This argument ignores the problem, previously considered, of the limitation upon the right to sue, found in the performance bond. As previously noted, Home's position on that question is meritorious. No recovery on the performance bond is available to Martin.

Neither of the respondents is entitled to recover on the performance bond. The trial court's judgments awarding respondents recovery on the performance bond must be reversed. Neither of the respondents has advanced a theory entitling them to recover on the payment bond issued by Home.

In Cause No. 28,486, the judgment in favor of Kenneth Stahlhut against Home Indemnity Company is reversed.

In Cause No. 28,502, the judgment in favor of Martin Brothers Tile Company against Home Indemnity Company is reversed.

Judgments reversed.

All concur.